**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION**

**CRIMINAL NO.  2:05CR37**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **VS.** | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| | ) | |
| **CLEASTON JEFFERY DOCKERY** | ) | |
| | ) | |

**THIS MATTER** came on for hearing before the Court on September 22, 2005, on the Defendant's motion to dismiss Count Nine of the indictment filed herein.  The Government was represented by the United States Attorney, and the Defendant was present with counsel.  Both parties presented evidence and have filed briefs with the Court.  For the reasons stated below, the Court grants the Defendant's motion.

## I.  FACTUAL AND PROCEDURAL HISTORY

In Count Nine of the indictment filed April 4, 2005, the Government charges that on or about August 14, 2004, the Defendant "did receive, possess, barter, and dispose of a stolen Glock 9mm firearm, which had been

shipped and transported in interstate commerce before it was stolen[,]" in violation of 18 U.S.C. 922(j). The Defendant does not deny that he is guilty of this crime; in fact, he entered into a plea agreement with the Government on August 5, 2005, admitting his guilt of this offense. **See Plea Agreement, filed August 5, 2005.** Nevertheless, the Defendant contends this charge should be dismissed because he was promised that he would not be charged for a gun violation by the federal officers investigating this matter, U.S. Forest Service Special Agent Russ Arthur and/or U.S. Forest Service Officer Brian Southard. The Government does not dispute the fact that Arthur and Southard were acting in their official capacities at the time they were investigating these charges against the Defendant.

At the hearing on Defendant's motion, Sandra Dockery, Defendant's mother, Todd Davis, a practicing attorney from Murphy, North Carolina, and the Defendant testified; Special Agent Arthur and Officer Southard also testified.

## II.  FINDINGS OF FACT

In August 2004, Arthur and Southard went to the home of the Defendant's mother for the purpose of talking to the Defendant about a variety of thefts of personal property from vehicles broken into that had been parked within the boundaries of the Nantahala National Forest.  They asked the Defendant to retrieve the stolen merchandise and specifically a gun that had been stolen from one of the vehicles.  The Defendant accompanied the officers to the jail where he gave a statement about the thefts and he ultimately retrieved the stolen merchandise for the officers.  A few days later, the officers returned to the mother's residence.  Both the Defendant and his mother were present as Arthur explained to them that he was anxious to recover the stolen gun.  He further advised the Defendant and his mother that the Defendant would not be charged with a gun charge if he retrieved the gun for the officers. Mrs. Dockery testified that "[Arthur] kept telling us they needed to retrieve this gun and . . . that we're not going to charge you, we're not going to charge you with this gun, . . . we just got to get the gun." **Transcript of Motion Hearing, filed September 28, 2005, at 9.**  Mrs. Dockery then stated that she telephoned attorney Todd Davis and advised him what Agent Arthur had

requested of the Defendant. Attorney Davis testified that Mrs. Dockery called him at his home and told him what was happening while she was simultaneously talking to the officers. *Id*., at 39. Davis testified that Mrs. Dockery's main concern was the officers trying to charge the Defendant with possession of a gun. *Id*., at 40. He also testified that he heard discussions between the officers and the Dockerys about "if he got the gun back that there would be no gun charge." *Id*. He also testified that there was no distinction about "whether or not he would be charged with theft of the gun and not be charged with possession of the gun." *Id*. Davis stated that it was his "understanding – from talking to [Mrs. Dockery] and her talking to [the officers] and me hearing them answer questions back, that if the gun was retrieved, that he would not be charged with the gun, with the firearm. *Id*., at 41. Davis further testified that he, the Dockerys, and the officers "went back and forth and everything was said and they were worried the gun was going to be used to commit the crimes, . . . finally, I agreed that it would be the best thing to do, with all their worries and concerns and assurances." *Id*., at 42.

Subsequently, the Defendant, Mrs. Dockery and Officer Southard met at Todd Davis' office for a debriefing session. According to Davis's testimony,

Officer Southard stated that "we're not going to charge him with – and I don't know if this is exact wordage, but, basically, it was, what I understood what he was saying is we're not going to charge him with bringing the gun back and having possession of it, but they were going to charge him with stealing it or having possession of it when he was stealing it, something to that effect." *Id*., at 44-45. Davis stated that he had never heard anything said about charging the Defendant with one thing and not another before this meeting in his office. *Id*., at 45. He also testified that he told the Defendant that "going to get the gun was going to make the gun charges go away. And so basically I tried to make it clear that I thought that that had been taken care of." *Id*.

The Defendant testified that he went from his home to the jail with the officers and agreed to cooperate with them and gave a detailed statement about the break-ins of the vehicles. At the first meeting at the jail, the officers requested him to get the firearm but his mother had advised him not to because she thought he could be charged with its possession. *Id*., at 68. A few days after this meeting, he met the officers again at his house and Arthur requested he get the gun back and he would not be charged with the firearm. *Id*., at 70. The Defendant further testified, "I under[stood] there would be no

charges on the firearm because he's the one that can write charges, or the officer is the one that [brings] the charges upon you. So I figure if he's giving me his word not to charge me, then I wouldn't be charged with it. *Id*. The Defendant admitted that the officers did not specifically state they would not charge him with possession but might charge him with some other firearm charge. *Id*. The Defendant further testified that it was his understanding that if he located the firearm and returned it to the officers, there would be no gun charge brought against him. *Id*., **at 71.** "[The officers] [told me] multiple times that there would be no gun charge. . . . I got my mother to call the lady that had the firearm because I didn't want any trouble on them. So she called and got the firearm brought to my house and she gave it to Russ Arthur." *Id*., **at 72.** The Defendant further testified that at the time the gun was delivered to his house and then to the agents, the officers never mentioned he would be charged with some other type of gun charge; instead "they took the gun and left." *Id*., **at 73.** The Defendant also testified that he returned all of the missing merchandise the officers had recorded on a list. *Id*., **at 74 ("They have everything back that was on the list that I took. They have everything back. I got everything back for them. Nothing is missing.").**

Special Agent Arthur testified that at the very first meeting the Defendant was told that if he would return the gun, he would not be charged with possession, but he would be charged with the larceny. Agent Arthur also testified that a distinction was made, again in the presence of Mrs. Dockery, that if the Defendant brought the gun back under the direction of the officers, that it would not be used against him for a separate charge. Arthur also testified that he further advised the Defendant and his mother that it was not his decision on what type of charges were going to be brought forward considering the evidence the agent had obtained to that point. Arthur testified that "it did appear confusing to the Dockerys, and I did spend a significant amount of time explaining that to them." *Id*., at 109. On cross-examination, Arthur testified that this distinction was not contained in his memorandum nor did he advise the Defendant "we're just going to charge you with what happened beforehand, not with possession if you turn it in." *Id*., at 111; *see also* Government Exhibit 3.

Officer Southard testified that Agent Arthur explained to Mrs. Dockery that the Defendant "would not be charged for going and getting the gun and

possessing it during that time period that it was under his direction." *Id.*, **at 115.**

### III.  DISCUSSION

In interpreting agreements between parties involving the Government and a defendant, a court "must apply fundamental contract and agency principles . . . as the best means to fair enforcement of the parties' agreed obligations." ***United States v. McIntosh*, 612 F.2d 835, 837 (4th Cir. 1979).** In this agreement, the Defendant had been promised that in return for retrieving the stolen firearm, "no gun charge would be laid."  As a result of this promise, it is apparent that the Defendant relied on that promise and promptly returned the weapon.  ***See United States v. Paiva*, 294 F. Supp. 742 (D.D.C. 1969).**  "[I]f, after having utilized its discretion to strike bargains with potential defendants, the Government seeks to avoid those arrangements by using the courts, its decision so to do will come under scrutiny.  If it further appears that the defendant, to his prejudice, performed his part of the agreement while the Government did not, the indictment may be dismissed." ***Id.*, at 747.**  "A contrary result would constitute a strong deterrent to the

willingness of defendants accused of . . . crimes to cooperate in speedy disposition of their cases and in apprehending and prosecuting codefendants." ***United States v. Carter*, 454 F.2d 426, 428 (4ᵗʰ Cir. 1972).** The Supreme Court has held that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." ***Santobello v. New York*, 404 U.S. 257, 262 (1971).** This Court sees no difference between a promise made by an officer or officers of a federal law enforcement agency and that of one charged with the duty to prosecute. The results are the same. The Defendant having relied on the word of officers and fulfilled his responsibility under his understanding of the agreement, his cooperation and subsequent plea agreement cannot be said to have been voluntarily and intelligently agreed upon. ***Id.; see also, United States v. Lester*, 247 F.2d 496 (2d Cir. 1957).** It is also worthy of note that a trained attorney listening to only parts of the conversation came to the same conclusions and understanding as those of the Defendant and his mother, who are uneducated in the law. Therefore, it appears to the undersigned that the Defendant reasonably relied on the officers' assurances that no gun charge would be filed

against him.  It is true that the officers felt they had fully explained their

intention to charge one firearm offense but not another.  It is also clear that

the Defendant as well as his mother concluded that no gun charge of any kind

would result.

> Agreements to exchange cooperation for transactional immunity are governed by traditional principles of contract law and, therefore, may be express or implied.  While a contract is made when the parties verbally express their mutual assent to its essential terms, it may also be implied when the parties' conduct manifests their agreement.  Under the concept of "equitable immunity," moreover, courts may enforce informal grants of transactional immunity where:
>> (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.

**United States v. McHan**, **101 F.3d 1027, 1034 (4th Cir. 1996) (quoting**

**Rowe v. Griffin**, **676 F.2d 524, 527-28 (11th Cir. 1982) (other internal**

**citations omitted).**

## IV.  ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion to dismiss

Count Nine of the indictment is **ALLOWED**, and the same is hereby

**DISMISSED WITH PREJUDICE.**

**Signed: October 11, 2005**

Lacy H. Thornburg
United States District Judge